John DOE, et al.

v.

**AMERICAN NATIONAL RED CROSS DBA Maryland Red Cross Chesapeake Region.**

**Civ. No. JFM–92–1107.**

United States District Court, D. Maryland.

Sept. 30, 1994.

---

collection unit in the American Red Cross' Washington, D.C. Region. On or about February 3, 1984, Jane Doe was admitted to Doctors' Hospital in Prince George's County suffering from severe anemia. She received the unit of blood that had been donated on January 12th. In March 1989, the donor of the blood died from AIDS. His physician reported the death to the Maryland Department of Health and Mental Hygiene which, in turn, informed the Red Cross. In October 1990 Jane Doe's blood tested positive for the HIV virus in two separate tests. On October 23, 1990, she was diagnosed with esophageal candidiasis, an AIDS defining illness. Eighteen months later, on May 1, 1992, Jane Doe died. Her death certificate lists AIDS as among the causes of death.

This action has been brought by John and Melanie Doe, the brother and daughter of Jane Doe. They allege that the Red Cross' negligence resulted in the death of Jane Doe. Specifically, they assert that the Red Cross was negligent because (1) it did not perform the Hepatitis B Core Antibodies Test as a surrogate test for detecting AIDS, (2) it did not screen donors by asking direct questions about their sexual history and (3) it did not provide adequate warnings of the fatal risk of transfusion-related AIDS. Discovery has now been completed, and the Red Cross has moved for summary judgment.

H. Robert Erwin, Pretl and Erwin, Baltimore, MD, for plaintiff.

Mark D. Gately, David Mitchell Feitel, James Mitchell Kearney, Miles and Stockbridge, Baltimore, MD, Stephen J. Hughes, Treanor, Pope and Hughes, and Neal M. Brown, Shaw and Brown, Towson, MD, for defendant.

## MEMORANDUM

MOTZ, District Judge.

On January 12, 1984, a young male donated a unit of blood at a mobile Red Cross

### I.

The parties agree that the ultimate issue presented in this case is whether the Red Cross met "the standard of care, skill and diligence that a reasonable [blood bank] would use under the same or similar circumstances." *Doe v. Miles Laboratories, Inc.,* 927 F.2d 187, 193 (4th Cir.1991).[1] They also agree, at least implicitly, that if the standard of care by which the Red Cross' conduct is to be measured is established by the industry practice and government regulations that were prevailing in January 1984, the Red

---

**1.** The parties debate whether the standard of care applicable to the Red Cross is a "professional" or an "ordinary" one. *Compare Smith v. Paslode,* 7 F.3d 116 (8th Cir.1993) *with Vuono v. New York Blood Ctr., Inc.,* 696 F.Supp. 743 (D.Mass.1988). However, they point to no practical differences that would flow under Maryland law from characterizing the standard of care one way or the other.

Cross is entitled to the summary judgment that it seeks. There is no evidence in the record that the Red Cross' actions that are complained of were contrary to any contemporaneous industry practice or applicable government regulation. To the contrary, the uncontradicted evidence is that the Red Cross' actions were in conformity with both.

Plaintiffs contend, however, that this is not dispositive. According to them, the Red Cross can be held liable if there is sufficient evidence from which a jury could reasonably conclude that the industry effectively controlled the government regulators and "unduly lagged in the adoption of new and available devices." *See Quintana v. United Blood Services*, 827 P.2d 509, 520 (Colo.1992), *citing The T.J. Hooper*, 60 F.2d 737, 740 (2nd Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932) (L. Hand, J).

## II.

Although the facts relevant to plaintiffs' separate allegations of negligence considerably overlap, in order to provide some structure to this opinion, I will divide my discussion of them into three separate parts. The first relates to the state of knowledge concerning transmissibility of AIDS by blood, the second to surrogate testing and the third to direct donor questioning.

### A.

The first reported case of what later became known as AIDS was published in the United States in 1981. By the middle of 1982 the medical community was aware that the disease was increasingly prevalent among hemophiliacs, homosexual men, persons of Haitian descent and intravenous drug users. In July of that year, the Centers For Disease Control ("CDC") published an article which described the cases of three hemophiliacs who had developed AIDS. The article concluded that "[a]lthough the cause of severe immune disfunction is unknown, the occurrence among the three hemophiliac cases suggests the possible transmission of an agent through blood products." In December 1982, the CDC published another article entitled "Possible Transfusion–Association Acquired Immunity Deficiency Syndrome."

That article reported that an infant who had received multiple transfusions at birth had developed AIDS and that an investigation revealed that one of the 19 donors of the blood had subsequently been diagnosed as being infected with AIDS. It concluded: "This report and continuing reports of AIDS among persons with hemophilia A raise serious questions about the possible transmission of AIDS through blood and blood products."

A month later, on January 4, 1983, the Public Health Service convened a workshop to discuss the report's implications. A wide range of medical and public health experts attended, including representatives from the CDC, the National Institutes of Health, Federal Drug Administration, the National Hemophilia Foundation, the New York and San Francisco Health Departments, the American National Red Cross and various other blood banking organizations. Representatives of the National Gay Task Force also participated. According to the summary report of the meeting, "[s]ome participants were reluctant to accept the hypothesis that AIDS has been transmitted by whole blood in the absence of additional evidence."

At the same time in early 1983, other experts had little or no doubt that AIDS was transmissible by blood. For example, the January 1983 newsletter of the Regional Comprehensive Hemophilia Center for Central and Northern Illinois stated "blood transmission of AIDS is now almost certain."

Study of and research into the question continued throughout 1983. In the middle of September, Dr. James W. Curran sent to the Red Cross a draft of an article that he had written documenting the transmission of AIDS through blood transfusions. This article was published in the New England Journal of Medicine on January 12, 1984. It is sadly ironic that this day was the same day on which the unit of blood containing the HIV virus here involved was donated.

### B.

It was not until April 1984 that scientists isolated the HTLV–III virus as the cause of AIDS. It was not until May 1985 that the FDA licensed a laboratory test, known as

"ELISA" (enzyme-linked-immuno-sorbent-assay), for detecting the virus' presence in donated blood and blood products.

Between the time that it first came to be understood that AIDS might be transmissible by blood and the licensing of the ELISA test, consideration was continuously given as to whether so-called surrogate testing of donated blood should be conducted. Such testing was not designed to identify the presence of the active agent causing AIDS (which, as stated above, was not isolated until April 1984) but to determine the presence of other agents that are common in the blood of those who engaged in high-risk behavior, i.e. intravenous drug use and acts of male homosexuality.

At the workshop convened by the FDA on January 4, 1993, surrogate testing was discussed as one of the principal possible strategies for reducing the risk of AIDS transmission via blood. It was noted that such testing had the advantages of "being objective" and "respect[ing] donor privacy." Two corresponding disadvantages were also noted: the expense that it would add to the blood collection process and the fact that it might "stigmatize as unsatisfactory many 'normal' donors for each potential AIDS transmitter that is being rejected." Although a consensus was reached at the meeting that steps should be taken to exclude high risk donors, neither surrogate testing nor direct donor questioning (which was also considered at the meeting) were selected as the methods to achieve that end. To the contrary, in January 1983, the Red Cross, the American Association of Blood Banks and the Council of Community Blood Centers released a Joint Statement, drafted with the assistance of the National Hemophilia Foundation, the American Blood Commission, the National Gay Task Force and representatives of the CDC, FDA and American Blood Resources Association, that expressly advised against both the use of surrogate tests and direct donor questioning.

According to Dr. Marcus Conant, one of plaintiffs' litigation experts, in February 1983 he and his colleagues at the University of California Medical Center in San Francisco "urged blood banks to investigate the feasibility of screening all donated blood for anti-HBc in order to reduce the risk of transfusion-transmitted AIDS." However, Conant was the chairman of the California State AIDS Task Force, which on September 26, 1983, issued a report that it did not recommend the institution of surrogate testing. Although the report noted that "several surrogate screening tests have been proposed and evaluations of some of the tests are in progress," it concluded that "since there is no specific predictive or diagnostic test for AIDS screening of blood donors, reliance must be placed on voluntary self-screening...." On July 1, 1983, the Stanford University Blood Bank implemented a T-cell test as a surrogate laboratory test for high risk behavior for AIDS. This is a different test than the test that plaintiffs contend here should have been implemented by the Red Cross. Stanford was the only blood banking organization that implemented any surrogate testing prior to January 1984.[2]

### C.

As noted above, at the January 4, 1983 workshop direct questioning of donors about their sexual orientation and history was considered as one of the steps that could be taken to exclude high risk donors. The advantages of such questioning were, as listed in the report, its low cost, its capability of being "directed toward high risk groups" and the fact that it would not be disruptive of the blood collection routine. However, direct donor questioning was considered to have the disadvantages of "being potentially intrusive into personal matters," being possibly unethical, having the potential of "institutional-

---

**2.** In his affidavit Dr. Conant notes that in the spring and early summer of 1984 at least four blood banks in California, including the San Jose Region of the Red Cross, began using anti-HBc testing of all blood collected. He further notes that in 1986 "the Red Cross and blood banks across the nation voluntarily (without specific recommendation from the FDA) implemented universal testing of donations for anti-HBc as a surrogate marker for non-A/non-B hepatitis." These observations are not material to this case since the blood from which Jane Doe was infected was donated in January 1984.

iz[ing] a stigma on groups already prone to prejudice and persecution" and possibly being "ineffective in identifying persons in these high risk groups." [3]

The Joint Statement issued on January 13, 1983 specifically rejected direct donor questioning as being an acceptable means for restricting blood donations. Addressing the question, the Joint Statement asserted:

> Direct or indirect questions about a donor's sexual preference are inappropriate. Such an invasion of privacy can be justified only if it demonstrates clear-cut benefit. In fact, there is reason to believe that such questions, no matter how well-intentioned, are ineffective in eliminating those donors who may carry AIDS. Blood banks should work with the leadership of groups which include individuals at high risk of AIDS.

The Joint Statement recommended that instead of instituting surrogate testing or direct donor questioning, blood banks should promote donor self-deferral from high risk groups. This was not intended to be a merely passive measure. Rather, blood donors were to be educated as to the risks and dangers to which they would be subjecting others by donating potentially infected blood. The Red Cross carried on a continuing dialogue on this subject with representatives of the gay community both on national and local levels. On January 6, 1983, immediately after the CDC's workshop, Dr. Paul R. McCurdy, who was then Medical Director of the Washington Region of the Red Cross, convened an open meeting with leaders of the homosexual community in the Washington, D.C. area. According to an affidavit that McCurdy has filed:

> My purpose in doing so was to inform the homosexual community of the CDC's recent epidemiological findings concerning the possible transmission of AIDS through blood and blood products, and to enlist its cooperation in the Red Cross's efforts to

protect the safety of the local blood supply. Over the ensuing months, my staff and I had another meeting and numerous conversations with leaders of the homosexual community to further discuss these issues. With the cooperation of the homosexual leadership in Washington, D.C., the Red Cross made extensive efforts to spread the message throughout the local homosexual community that sexually active homosexual and bisexual males should refrain from donating blood.

On March 17, 1983, McCurdy convened another open meeting of the leaders of the homosexual community in the Washington area to discuss the fact that the Red Cross was considering asking direct questions of all male donors about their sexual preferences and practices. In his affidavit, McCurdy describes the response to his announcement that the Red Cross was considering this proposal.

> As subsequently reported in the local press, virtually all participants in the meeting strongly opposed this proposal and felt that potential donors would not answer such direct questions truthfully because of fear of stigmatization. Indeed, one participant informed me that he would instruct all homosexual men affiliated with his organization to lie if the Red Cross questioned them about their sexual orientation as part of the health history screening process. See "Red Cross Backs Off of AIDS Blood Proposal," The Washington Blade, Vol. 14, No. 11 (Mar. 18, 1983). Based in part on the hostile response of homosexual leaders and threats to undermine the Red Cross's screening procedures, I concluded that direct questioning of male donors about their sexual preferences and practices would not be effective in further reducing the risk of transfusion-associated AIDS but instead, might well reduce the safety of the local blood supply.[4]

---

3. To the extent that the conference participants permitted their own political and social views (however enlightened) to influence a public health decision, they acted irresponsibly. However, it was entirely appropriate for them to consider whether direct donor questioning would be effective.

4. According to affidavits submitted by S. Gerald Sandler, who was at all relevant times the Chief Medical Officer, Blood Services of the Red Cross, the reaction of the gay community in Washington was not unique. Beginning with the earliest reports of possible transfusion-associated AIDS, Sandler and other representatives of the Red

After the meeting, McCurdy and other members of the Red Cross staff continued their educational campaign to ensure that homosexuals at high risk for AIDS understood the importance of not donating blood. They corresponded with representatives of the homosexual community and circulated to them a pamphlet that, *inter alia,* encouraged high risk donors for AIDS not to donate blood.

The record does not reveal if prior to January 1984 (indeed, ever) any blood bank ever engaged in direct questioning of donors about their sexual history or orientation.

### III.

On the basis of this evidence, the Red Cross would be entitled to a judgment as a matter of law at trial. Accordingly, it is entitled to summary judgment now. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A.

Plaintiffs' evidentiary support for their surrogate testing claim is scant. They rely primarily upon documents and testimony that suggests that by January 1984 it was generally accepted that AIDS was transmissible by blood.[5] Evidence of that fact alone, however, is far from sufficient to sustain plaintiffs' burden. What plaintiffs must demonstrate is that the failure to adopt surrogate testing in response to the increasing recognition of the transmissibility of AIDS by blood was negligent. On that point plaintiffs have presented virtually no evidence at all.

All that they have produced are the opinions of Dr. Conant and of a second litigation expert, Dr. Donald P. Francis, that the Red Cross should have been administering surrogate tests by January 1984. As a matter of historical fact, however, Dr. Conant had been unable to persuade his colleagues on the California State AIDS Task Force that he chaired to implement surrogate testing when it issued its report in the latter part of September 1983. Furthermore, the only contemporaneous evidence to which Dr. Conant and Dr. Francis can point in support of their opinions is that on July 1, 1983, the Stanford University Blood Bank implemented a surrogate laboratory test. That test, however, was different from that which they now assert should have been administered.

Moreover, the record proves that the Red Cross, other members of the blood banking community and government regulators articulated concerns about implementing surrogate testing, including the cost of such testing and its detrimental effect upon the blood supply.[6] No reasonable inference can be

Cross (as well as representatives of the CDC, the FDA and other constituent members of the blood banking community) attempted to open channels of communication with various gay organizations. Sandler states that in public and private meetings with representatives of those associations "the Red Cross and others broached the possibility of direct questioning of donors about their sexual preferences and practices as a method of identifying homosexual and bisexual males at high risk for AIDS. This proposal was vigorously opposed by homosexual organizations, which expressed concern that such measures would further stigmatize groups already subject to prejudice and discrimination. Homosexual activists made it known throughout the blood banking community that they would encourage persons affiliated with the organizations to donate blood and lie about their sexual orientation if blood banks implemented direct questions as part of donor health history screening."

5. In *Doe v. Miles Laboratories, Inc.,* 927 F.2d at 194, the Fourth Circuit stated that "the evidence shows that ... [in September 1983] the risk that

AIDS was transmissible through blood was merely a *possibility.* In fact, appellants have presented no evidence indicating that there existed in 1983 a medical consensus that AIDS was transmissible by blood." *Doe* is distinguishable on the ground that here plaintiffs rely, in part, upon the fact that by the latter part of 1983 there was greater information (specifically, the draft of the Curran article first sent to the Red Cross in mid-September) demonstrating that AIDS was transmissible by blood. More generally, the court in *Miles Laboratories* did nothing more than uphold the granting of a summary judgment in favor of defendant on the record there presented. It is incumbent upon me to base my decision upon the evidence that has been presented on the summary judgment record before me.

6. Of course, if the safety of the blood supply was the only legitimate concern of the blood banking community, any test that would keep any potentially infected blood from the supply should have been adopted. However, that was not the only legitimate concern. Cold-hearted though costs

drawn from the record that these concerns were anything but legitimate, and however those concerns may be resolved in hindsight, a factor of the time necessary to resolve them must be inserted into the equation when determining whether the industry had "unduly lagged in the adoption of new and available devices." Here, viewing the evidence most favorably to plaintiffs, all that can be said is that blood bankers and government regulators did not immediately follow the approach that plaintiffs' experts believed should have been followed. There is no evidence that blood bankers and government regulators were not struggling in good faith with issues of unknown dimension or that they were not reasonably attempting to chart what were then highly uncertain seas.

## B.

■ Plaintiffs' claim concerning direct donor questioning is equally unsupported by the evidence. They support their contention that the Red Cross should have directly asked potential donors about their sexual history only by the affidavits of their two litigation experts that direct donor questioning would have been more effective in screening out high risk donors than was the "self-deferral" method that the Red Cross and all other blood bankers were using. These opinions, in turn, are substantiated only by the fact that in 1987 and 1988 studies of the efficacy of direct questioning were conducted and that the results of those studies, published in a 1989 issue of *Transfusion*, showed that direct questions were more effective than self-deferral.

Recognizing that these studies had not been conducted by January 12, 1984—the date here in question—plaintiffs and their experts argue that the Red Cross should have itself conducted such studies in 1983. The question of whether such studies could have been completed and subjected to peer

review by January 1984 aside, it would be unreasonable as a matter of law to hold that the Red Cross would have been required to base its policy on the results of such studies in the face of the widespread hostility to direct donor questioning that the Red Cross was encountering in the dialogue in which it was engaging with representatives of the gay community. Indeed, if the Red Cross had followed this hypothetical course, it might well have been subjecting itself to liability from AIDS-infected blood donees on the ground that it ignored the active resistance of the gay community to invasive questioning—a fact of which it had direct knowledge.

## C.

■ Plaintiffs' final claim is that the Red Cross did not provide adequate warnings concerning the risk that AIDS was transmissible by blood transfusion. Under the learned intermediary doctrine, recognized under Maryland law, the Red Cross had no obligation to warn individual patients of this risk. *See, e.g., Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003 (4th Cir.1992); *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 95 (D.Md.1989), *aff'd,* 898 F.2d 146 (4th Cir. 1990). Rather, its duty ran to medical professionals, including transfusion services, hospitals and treating physicians. It fully met this duty beginning with the Joint Statement of January 13, 1983 that was widely distributed and published in *Transfusion.* While stating that "evidence for transmission by blood transfusion is inconclusive at this time," the Joint Statement did state that the medical community was obliged to respond to that possibility and that physicians had to be educated "to balance the decision to use each blood component against the risks of transfusion, be they well established (e.g. hepatitis, cytomegalovirus, malaria) or under investigation (e.g. AIDS)." The Red Cross conducted

analyses often seem, responsible decision-makers cannot ignore the fact that resources are not unlimited and must be reasonably allocated. Moreover, blood bankers and governmental regulators also had to consider the extent to which the rejection of uninfected blood by a surrogate test would threaten the adequacy of the blood supply. Thus, they had to balance the number of persons who might be infected by transfusions of

blood containing the AIDS virus against the number of persons who might die because blood was unavailable for necessary transfusions. The record does not establish that these numbers were clearly known or capable of responsible estimate by January 1984, and plaintiffs have thus not proven that the Red Cross was negligent in striking the balance which it did when rejecting surrogate testing.

education programs throughout 1983 (and thereafter) both nationally and locally. At least one presentation concerning the risk of AIDS being transmissible by blood was held at Doctor's Hospital of Prince George's County, the hospital where Jane Doe received her transfusion.[7]

For these reasons I find that the Red Cross is entitled to the summary judgment that it seeks.

7. Plaintiffs complain that a June 23, 1983 Joint Statement on Directed Donation and AIDS, authored by the Red Cross, the American Association of Blood Banks and the Council of Community Blood Banks assured the medical community and the American public that the risk of possible transfusion-associated AIDS was on the order of one case per million patients transfused. This figure was derived by taking the number of blood recipients who had developed AIDS and dividing by the total number of transfusion recipients. Plaintiffs allege that this method was clearly er-

roneous because it failed to take into account any factor for infected asymptomatic recipients due to the "latency period" that the disease entails. This contention is purely "20/20 hindsight," as evidenced by the fact that Dr. Conant used precisely the same figure in a public announcement that he made on September 30, 1983. Similarly, although Dr. Francis assessed the risk at 1 to 500,000, there is no evidence that he took the latency period into account in making his calculation.