**Flora MOTUS, Plaintiff,**

v.

**PFIZER INC., Defendant.**

**No. CV00–298 AHM.**

United States District Court, C.D. California.

Dec. 20, 2001.

George W. Murgatroyd, III, Karen Ann Barth, Baum Hedlund Aristei Guilford & Schiavo, Los Angeles, CA, for Plaintiff.

Pierce O'Donnell, Ann M. Mortimer, Randy R. Merritt, Daniel C. Tepstein, O'Donnell & Shaeffer, Los Angeles, CA, Malcolm E. Wheeler, Amy L. Padden, James E. Hooper, Michael L. O'Donnell, Wheeler Trigg & Kennedy, Denver, CO, for Defendant.

## ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT

MATZ, District Judge.

## I.

## INTRODUCTION

Six days after Dr. Gerald Trostler prescribed Zoloft to Victor Motus, Mr. Motus took his life. His widow, Flora Motus, sued Zoloft's manufacturer, Pfizer Inc., for failing to adequately warn that Zoloft can cause those who ingest it to commit suicide. She alleges five claims: (1) "wrongful death/negligence"; (2) strict liability; (3) "survival action"; (4) fraud; and (5) breach of warranty. Each of Ms. Motus's claims is premised on the allegation that Pfizer's "package insert and marketing materials do not warn ... that [Zoloft] can cause some people to think and act in violent or suicidal ways." First Amended Complaint ("FAC") ¶ 20. She alleges that Pfizer's failure to warn of this risk caused her husband to commit suicide. FAC ¶ 28(d) (wrongful death/negligence claim); ¶ 38 (strict liability); ¶ 50–52 (fraud); ¶ 59 (breach of warranty).

Pfizer now moves for summary judgment on the ground that Ms. Motus cannot prove that its alleged failure to warn or inadequate warning caused her injury. Pfizer argues that Ms. Motus has no evidence that Dr. Trostler would have acted differently had adequate warnings been provided. The Court agrees with Pfizer, and accordingly grants it summary judgment on all claims.

## II.

## FACTUAL BACKGROUND

### A. *Dr. Trostler Prescribes Zoloft to Victor Motus*

Mr. Motus first saw Dr. Trostler on July 16, 1998 because he was having trouble controlling his diabetes and cholesterol. Trostler Depo. at 14, 48. Mr. Motus did not mention any symptoms of anxiety or depression during his first visit, nor during his next three visits to Dr. Trostler on July 27, August 25, and October 13. *Id.* at 50–51. Mr. Motus visited Dr. Trostler for the last time on November 6, 1998. Plaintiff's Statement of Genuine Issues ("SGI") ¶ 1. During that visit, Mr. Motus appeared "unhappy," "depressed," and "frustrated," and he "had a lot on his mind that he wanted to share" with Dr. Trostler. Trostler Depo. at 76–77. Mr. Motus told Dr. Trostler that his savings of $150,000 were gone, that he was losing $5,000 to $10,000 per week on a bad investment, that he could not sleep, that he was the president of a school district, that he had a political problem and that he had some numbness in his hands. *Id.* at 53, 81. Mr. Motus also told Dr. Trostler that he was contemplating bankruptcy. *Id.* at 79.

As a result of these revelations, Dr. Trostler concluded that Mr. Motus was moderately depressed. *Id.* at 54. Dr. Trostler did not think that Mr. Motus was suicidal or sufficiently depressed to warrant sending Mr. Motus to a mental health professional. *Id.* at 54. Dr. Trostler prescribed Mr. Motus 25 milligrams of Zoloft for seven days, followed by 50 milligrams of Zoloft for fourteen days. *Id.* at 53–54.

To fill this prescription, Dr. Trostler gave Mr. Motus a sample packet of Zoloft, which he had received from a Pfizer representative. *Id.* at 19, 54. The sample packet did not have any warning printed on it. *Id.* at 24. Dr. Trostler opined that the box

containing the sample packets probably did contain a package insert (i.e., an insert that contains information about the drug, including warnings), or that each sample packet originally came with the package insert attached, but he could not recall removing the package insert from the packets or whether one package insert came in the box of samples. *Id.* at 96.

Dr. Trostler did not provide Mr. Motus with a package insert or any other written information concerning Zoloft, and he could not recall whether he had any promotional materials for Zoloft in his office at the time he prescribed Zoloft for Mr. Motus. *Id.* at 113. Dr. Trostler did not warn Mr. Motus that taking Zoloft could cause him to have suicidal thoughts or experience akathisia.[1] *Id.* at 29. He did not discuss with Mr. Motus any contraindications of taking Zoloft, and was not aware of any contraindications that would have suggested Mr. Motus was not a good candidate for Zoloft. *Id.* at 98. During Dr. Trostler's deposition, Plaintiff's lawyer asked: "If you had been told that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, is that the kind of information you would pass on to your patients?" Dr. Trostler responded, "Yes." *Id.* at 27–28.

Dr. Trostler told Mr. Motus to call him if his condition worsened or if he experienced any side effects, and he also had Mr. Motus schedule a follow-up appointment for November 26 (i.e., twenty days later). *Id.* at 99–100. Before Mr. Motus took his life, Dr. Trostler did not speak to Mr. Motus or any member of Mr. Motus's family and he did not know whether Mr. Motus experienced adverse reactions to Zoloft, such as confusion, akathisia, or suicidal thoughts. *Id.* at 39–40, 100–01. Six days later, on November 12, 1998, Mr. Motus committed suicide by shooting himself. SGI ¶ 3.

### B. *How Did Dr. Trostler Learn About Zoloft?*

Dr. Trostler could not recall reviewing any information from Pfizer before deciding to prescribe Zoloft to Mr. Motus, although he "may have" relied on some unspecified written information from an "article or seminar." *Id.* at 92. He stated that his familiarity with Zoloft was "probably multisource," and included "reading articles" and attending "drug company meetings." Trostler Depo. at 15–16. By "drug company meetings," Dr. Trostler meant physician meetings such as seminars, lectures or conferences, where information was delivered by various people, including drug company representatives. *Id.* at 16–17. Dr. Trostler stated that the articles he read were "occasional articles that appear[ed] in journals to which I subscribe," such as the New England Journal of Medicine and the Annals of Internal Medicine. Dr. Trostler stated that he also received "hundreds of journals that come to the office unsolicited." *Id.* at 16.

Plaintiff argues that Dr. Trostler obtained information from sources other than the package insert, such as "PDR's" (Physician's Desk Reference), "Dear Doctor" letters and promotional activities of sales people. There is no evidence that he obtained information about Zoloft from the first two sources. As to sales representatives, Dr. Trostler stated that before the death of Mr. Motus, he "probably did have conversations about Zoloft with Pfizer representatives, but I don't specifically recall." *Id.* at 91. When asked whether he re-

---

**1.** The symptoms of akathisia include increased muscle movement, agitation, and restlessness. Trostler Depo. at 92.

called any particular meeting where Zoloft was discussed, Dr. Trostler responded "No," *id.* at 17, and he could not remember the substance of any conversations he may have had with a Pfizer representative concerning Zoloft. *Id.* at 90–91. Dr. Trostler also could not recall whether Pfizer representatives brought him scientific articles or patient information brochures in 1998. *Id.* at 60. Nor could Dr. Trostler recall whether he discussed Zoloft with his colleagues. *Id.* at 96.

Even though Dr. Trostler stated that he could not recall any particular meeting in which he discussed Zoloft with a Pfizer representative, certain parts of his deposition indicate that he did, in fact, recall the substance of at least some meetings. For example, when asked: "In talking to Zoloft representatives . . . did they recommend different medical conditions to prescribe Zoloft to treat?," Dr. Trostler replied "Yes," and indicated that depression and panic attacks were two of those conditions. *Id.* at 45–46. Dr. Trostler also stated that in discussing Zoloft with Pfizer's representatives, they never told him that Zoloft could: (1) cause akathisia; (2) worsen a patient's situation; (3) cause a patient to have suicidal thoughts; (4) cause a patient to experience a feeling so acute that death is a welcome result; or (5) increase the risk that a patient would commit suicide. *Id.* at 20, 26. Dr. Trostler could not recall whether the drug representatives told him

that once he prescribed Zoloft, he needed to closely supervise his patient. *Id.* at 25.

### C. *Why Did Dr. Trostler Decide to Prescribe Zoloft for Victor Motus?*

Dr. Trostler stated that he relied solely on his "training and experience" in making his clinical evaluation that Mr. Motus was depressed. *Id.* at 83, 86. He admitted that he prescribed drugs without having previously reviewed the package insert, and that he first reviewed the package insert for Zoloft after Mr. Motus committed suicide. *Id.* at 88–89; SGI ¶¶ 8–9.[2] Dr. Trostler stated that his "clinical experience" was the "ultimate determinant" for whether he would prescribe a drug, and that he would not prescribe a drug based on what a drug representative told him if he had concerns about a drug's safety or effectiveness. *Id.* at 90.

When asked: "In deciding to prescribe Mr. Motus Zoloft, did you rely specifically on any statements made to you by Pfizer representatives?," Dr. Trostler replied, "No." When asked: "Did you rely on any materials provided to you by Pfizer sales representatives in making your decision to prescribe Zoloft to Mr. Motus?," Dr. Trostler replied, "No." *Id.* at 91–92; 123–24. When asked: "Did any written material provided to you by a Pfizer representative regarding Zoloft cause you to prescribe Zoloft to Mr. Motus?," Dr. Trostler replied, "No." *Id.* at 113.

---

**2.** The package insert made the following references to suicide. First, the "Adverse Reactions" section listed "suicide ideation and attempt" as events that had occurred in clinical trials and the frequency with which they had occurred. Pfizer's Exh. 26. Second, the "Adverse Reactions" section stated "It is important to emphasize that although the events reported occurred during treatment with Zoloft, they were not necessarily caused by it." *Id.* Third, the "Precautions" section stated, "The possibility of a suicide attempt is inher-

ent in depression and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy. Prescriptions for Zoloft should be written for the smallest quantity of tablets consistent with good patient management in order to reduce the risk of overdose." *Id.* It is not disputed that the Food and Drug Administration ("FDA") approved this labeling. See *Motus v. Pfizer Inc.*, 127 F.Supp.2d 1085, 1088 (C.D.Cal.2000).

## D. *Dr. Trostler's Awareness of a Possible Relationship Between Zoloft and Suicide Before He Prescribed Zoloft to Mr. Motus*

Dr. Trostler stated that he was aware, before he prescribed Zoloft to Mr. Motus, that there were some claims that SSRI drugs[3] were linked to increased suicide and violence, but that he discounted these claims based on his personal experience. *Id.* at 105. Indeed, even as late as his deposition, Dr. Trostler stated, "My personal belief is that SSRIs do not cause people to commit suicide." He stated in particular that he "was aware that there had been some publicity about individuals taking SSRI's and committing suicide or violent behavior." *Id.* at 124. When asked, however, whether he was "aware that serotonin is associated with suicide and violence," Dr. Trostler responded "No," and also indicated that he had never seen any articles discussing the subject. *Id.* at 18. Dr. Trostler could not recall reading any articles about Zoloft and suicide or suicidal ideation. *Id.* at 92.

What is *absent* from Dr. Trostler's deposition may be as significant for purposes of this motion as what he did say. Plaintiff never asked Dr. Trostler whether he would have changed his decision to prescribe Zoloft to Mr. Motus if Pfizer had provided a specified warning about the risk of suicide associated with ingestion of the drug. Plaintiff also never asked Dr. Trostler whether the warning she thinks was required would have affected what Dr. Trostler said to Mr. Motus at the time he prescribed him Zoloft.

---

3. "SSRI" refers to a class of medicines known as "selective seritonin reuptake inhibitors." Zoloft is an SSRI drug.

4. Plaintiff and Defendant disagree over whether Pfizer provided inadequate warnings regarding the link between Zoloft and suicide

## III.

## DISCUSSION

Pfizer moves for summary judgment on the ground that even if the warnings on the Zoloft package inserts or elsewhere were inadequate, Ms. Motus cannot prove that the inadequacy caused her injury— i.e., led to Mr. Motus's death—because, in deciding to prescribe Zoloft for Mr. Motus, Dr. Trostler did not rely on any information from Pfizer. Def.'s Mot. at 1. The absence of an adequate warning that Zoloft can cause suicide or akathisia is immaterial, Pfizer argues, because even if such a warning had been provided it would not have changed either Dr. Trostler's decision to prescribe Zoloft or the information he relayed to Mr. Motus about Zoloft. *Id.* Pfizer also argues that Ms. Motus cannot prove that the absence of an adequate warning or, as Plaintiff sees it, any warning,[4] caused her injury, because Dr. Trostler already was aware of claims that SSRIs like Zoloft could increase suicidality and violence when he prescribed Zoloft to Mr. Motus. *Id.* Therefore, Pfizer argues, because Dr. Trostler was already aware of the "risk" at issue, the failure to warn him of the risk could not have been the cause of Mr. Motus's death. *Id.* at 2.

### A. *General Standards Governing Summary Judgment Motions*

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

or whether it failed to provide any warning at all. The Court need not resolve this disagreement to decide this summary judgment motion, although the statements described in footnote two certainly appear to be admonitions.

and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir.2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party; the moving party need not disprove the other party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Id.* at 322, 106 S.Ct. 2548.

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (*citing Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

**B.** *California Law Governing Failure-to-Warn Cases*

 California law applies in this diversity action. It is well-settled that a manufacturer of prescription drugs owes to the medical profession the duty of providing adequate warnings if it knows, or has reason to know, of any dangerous side effects of its drugs. *Carlin v. The Superior Court of Sutter County,* 13 Cal.4th 1104, 1112–13, 56 Cal.Rptr.2d 162, 920 P.2d 1347 (1996). California follows the learned intermediary doctrine, which states that in the case of prescription drugs, the duty to warn "runs to the physician, not to the patient." *Id.* at 1116, 56 Cal.Rptr.2d 162, 920 P.2d 1347 (citations omitted). Thus, a

manufacturer discharges its duty to warn if it provides adequate warnings to the physician about any known or reasonably knowable dangerous side effects, regardless of whether the warning reaches the patient.

■ A plaintiff asserting causes of action based on a failure to warn must prove not only that no warning was provided or the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury. *Plummer v. Lederle Laboratories*, 819 F.2d 349, 358 (2d Cir.1987) (applying California law); *Kirsch v. Picker Int'l*, 753 F.2d 670, 671 (8th Cir.1985); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645 (4th Cir.1981).

Pfizer tacitly concedes for purposes of this summary judgment motion that its warning about the risk of suicide was inadequate. It moves for summary judgment on the ground that Ms. Motus cannot demonstrate that the inadequate warning was the proximate cause of her injury, because she has failed to demonstrate that the inclusion of an adequate warning would have altered Dr. Trostler's decision to prescribe Zoloft to Mr. Motus. If it is not genuinely disputable that Dr. Trostler would have prescribed Zoloft to Mr. Motus even if Pfizer had provided an adequate warning about the risk of suicide, then Ms. Motus cannot prove proximate cause, and Pfizer is entitled to summary judgment.

## C. The Burden of Proof and the Rebuttable Presumption

Both sides agree that under California law Plaintiff must prove that Pfizer's alleged failure to warn or inadequate warning was a "substantial factor" in bringing about Mr. Motus's death. *Rutherford v. Owens–Illinois, Inc.*, 16 Cal.4th 953, 968, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (1997). The threshold issue here is whether she can do so by invoking the rebuttable presumption, adopted by some states, that

had there been an adequate warning, the doctor would have heeded it. Courts have premised the adoption of this presumption on the following language in comment j of section 402A of the Restatement (Second) of Torts:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if followed, is not in defective condition, nor is it unreasonably dangerous.

*See Thomas v. Hoffman–LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir.1992) (explaining origin of presumption).

Under the rebuttable presumption, once the plaintiff establishes that the manufacturer provided inadequate warnings, the burden shifts to the defendant to show that an adequate warning would not have affected the doctor's conduct in prescribing the drug. If the defendant fails to make that showing, "the presumption satisfies the plaintiff's burden of demonstrating that the inadequate warning was the proximate cause of the ingestion of the drug." *Williams v. Lederle Laboratories*, 591 F.Supp. 381, 386 (S.D.Ohio 1984)(presumption applies in Ohio); *see also, Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80–81 (1st Cir.1992) (presumption applies in Massachusetts); *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir.1974) (predicting that Texas courts would adopt presumption). The rebuttable presumption is simply a burden-shifting device that makes it easier for a plaintiff to prove causation.

■ By contrast, in states that have not adopted the rebuttable presumption, the plaintiff in a prescription drug case bears the full burden of proving through affirmative evidence that the inadequate warning was the proximate cause of the injury, or, in other words, that an adequate warning to the prescribing physician would have altered the physician's conduct. *Windham*

v. *Wyeth Laboratories, Inc.*, 786 F.Supp. 607, 612 (S.D.Miss.1992) (describing plaintiff's burden in Mississippi, which has not adopted the presumption).

In this case, if the presumption applies, Pfizer must come forward with evidence affirmatively demonstrating that an adequate warning would not have affected Dr. Trostler's decision to prescribe Zoloft to Mr. Motus. If the rebuttable presumption does not apply, Pfizer may prevail by showing that Plaintiff lacks evidence establishing that an adequate warning would have affected Dr. Trostler's decision to prescribe Zoloft. Pfizer need not produce its own evidence; pointing to an absence of evidence on Plaintiff's part is sufficient. See *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

**D. *Does California Apply the Rebuttable Presumption?*** [5]

■ "A federal court sitting in diversity must follow the law directed by the Supreme Court of the state whose law is found to be applicable, and if there is no direct decision by the highest court of that state, the federal court should determine what it believes that state's highest court would find if the issue were before it." *Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.1987) (citation omitted).

Plaintiff asserts that California has adopted the presumption, and that it applies to this case. Opposition at 3 (citing *Dimond v. Caterpillar Tractor Co.*, 65 Cal. App.3d 173, 134 Cal.Rptr. 895 (1976)). In *Dimond*, however, the intermediate appellate court did *not* apply the rebuttable presumption, and was not even faced with a situation in which it had to decide whether the rebuttable presumption applied. *Dimond* merely cited cases adopting the rebuttable presumption to support its holding that the jury could have reasonably inferred that an inadequate warning caused the plaintiff to jump out of a forklift, thus causing his injuries. *Id.* at 185 n. 8, 134 Cal.Rptr. 895. The court explicitly stated that it had not found any case indicating whether California had adopted the presumption, and did not take a position on whether California should do so. *Id.*

As Defendant argues in its supplemental brief, California appellate courts—citing comment j to section 402A of the Restatement (Second) of Torts—have reasoned that when an adequate warning is provided to the plaintiff, the defendant *manufacturer* "may assume that it will be read and heeded." *Carmichael v. Reitz*, 17 Cal. App.3d 958, 991, 95 Cal.Rptr. 381 (1971) (affirming judgment for manufacturer); *Oakes v. E.I. DuPont de Nemours & Co.*, 272 Cal.App.2d 645, 77 Cal.Rptr. 709 (1969) (same). Plaintiff has cited no California case using comment j to shift either the burden of proof as to causation or the burden of going forward to a defendant in a failure-to-warn case.

Moreover, even if California *had* adopted the rebuttable presumption in failure-to-warn cases generally, California courts would not necessarily apply that presumption in the prescription drug context, which raises distinct policy concerns. For example, comment k to section 402A of the Restatement (Second) of Torts recommends that courts refrain from imposing strict liability on prescription drug manufacturers for risks that could not scientifically be known at the time the drug

---

**5.** At the hearing on this motion, the Court ordered the parties to submit supplemental briefing on the issue whether the California Supreme Court has or would adopt the rebuttable presumption in the prescription drug context. This helpful briefing confirmed the Court's previously-communicated tentative conclusion that the California Supreme Court has not applied and would not apply the presumption.

was manufactured, which is a departure from the prevalent strict liability rule imposed on manufacturers generally. Comment k was drafted specifically to address the concern that "drugs should be exempted from strict liability on the ground that it would be 'against the public interest' to apply the doctrine to such products because of the very serious tendency to stifle medical research and testing." *Brown v. Superior Court of City and County of San Francisco,* 44 Cal.3d 1049, 1058, 245 Cal. Rptr. 412, 751 P.2d 470 (1988). In *Brown,* the California Supreme Court adopted comment k to the extent it recommends refraining from imposing strict liability on manufacturers for risks that could not be scientifically known at the time the drug was manufactured. In so holding, the *Brown* Court noted:

> [There is] an important distinction between prescription drugs and other products such as construction machinery [citation], a lawnmower [citation], or perfume [citation], the producers of which were held strictly liable. In the latter cases, the product is used to make work easier or to provide pleasure, while in the former it may be necessary to alleviate pain or to sustain life. Moreover, unlike other important medical products (wheelchairs, for example), harm to some users from prescription drugs is unavoidable. Because of these distinctions, the broader public interest in the availability of drugs must be considered in deciding the appropriate standard of liability for injuries resulting from their use.

*Id.* at 1063, 245 Cal.Rptr. 412, 751 P.2d 470. Comment k "has been adopted in the overwhelming majority of jurisdictions that have considered the matter." *Id.* at 1059, 245 Cal.Rptr. 412, 751 P.2d 470.

The Court recognizes the difficulty in predicting how the California Supreme Court would rule on the issue whether prescription drug manufacturers should be subject to the application of the rebuttable presumption. In *Carlin,* for example, the California Supreme Court held that manufacturers of prescription drugs can be held strictly liable for failing to warn of risks that are scientifically knowable, but which were not actually known to the drug manufacturer at the time it manufactured the drug. 13 Cal.4th 1104, 56 Cal.Rptr.2d 162, 920 P.2d 1347 (1996). In reaching this conclusion, the *Carlin* Court minimized the differences between strict liability rules in the prescription drug context and in the non-prescription drug context. *See id.* at 1111, 56 Cal.Rptr.2d 162, 920 P.2d 1347 (" 'We ... do not interpret *Brown*'s analysis of the failure to warn issue to necessarily be limited to prescription drug cases. The same rationale applies equally to other products.' ") (quoting *Anderson v. Owens–Corning Fiberglas Corp.,* 53 Cal.3d 987, 281 Cal.Rptr. 528, 810 P.2d 549 (1991)). If in fact California had adopted the rebuttable presumption in a failure-to-warn case involving a product other than a prescription drug, this language in *Carlin* might be some indication that the California Supreme Court would also adopt the rebuttable presumption in the prescription drug failure-to-warn context.

But in fact, no California court *has* adopted or applied that presumption, and several California courts have decided whether proximate cause has been or can be established in prescription drug and medical device failure-to-warn cases without mentioning the rebuttable presumption. For example, in *Plenger v. Alza Corp.,* 11 Cal.App.4th 349, 13 Cal.Rptr.2d 811 (1992), the plaintiffs sued an IUD manufacturer after their wife and mother died as a result of an infection caused by her use of an IUD. The plaintiffs alleged that the warnings the manufacturer gave the decedent's doctor were inadequate because the package insert did not inform of the risk of infection resulting in death from

the implantation and use of an IUD. An expert testified that at the time the doctor implanted the IUD into the decedent, the risk of pelvic infection from the insertion of an IUD was well known in the medical community. *Id.* at 362, 13 Cal.Rptr.2d 811. The court granted summary judgment to the defendant on the ground that the risk of infection and death was so well known in the medical profession that the failure to warn the physician of that risk could not be the legal cause of the decedent's death. *Id.* If the rebuttable presumption had been applied in *Plenger,* the court would have assumed that the doctor would have heeded an adequate warning about the risk of infection and death from the implantation of IUDs, and so the defendant would have had the burden to demonstrate with affirmative evidence that the doctor still would have implanted the IUD even if an adequate warning had been provided.

In addition to *Plenger,* other California cases involving drug or medical device manufacturers include *Huntman v. Danek Medical, Inc.,* 1998 WL 663362 (S.D.Cal. 1998) (granting summary judgment under California law to manufacturer in medical device failure-to-warn case on ground that doctor did not rely on any statements by manufacturer in decision to perform treatment and not mentioning rebuttable presumption), and *Plummer,* 819 F.2d at 355–56, 358 (2d Cir.1987) (applying California law) (noting the portion of comment j stating the presumption that once a warning is given it will be read and heeded, but not using that comment to shift the burden on proximate cause to the defendant, and holding that "the plaintiff failed to prove that a proper warning would have altered the doctor's conduct").

Perhaps the most persuasive California case on this point is *Ramirez v. Plough, Inc.,* 6 Cal.4th 539, 25 Cal.Rptr.2d 97, 863 P.2d 167 (1993), a failure-to-warn case in-volving a non-prescription drug. In *Ramirez,* an infant sued a drug manufacturer, alleging that he contracted Reyes Syndrome as a result of ingesting non-prescription aspirin. The product label, which was entirely in English, contained a warning that aspirin has been associated with Reyes Syndrome and stated that the dosage for a child under two should be "as directed by doctor." *Id.* at 543–44, 25 Cal.Rptr.2d 97, 863 P.2d 167. The plaintiff's mother, who was literate only in Spanish, did not consult a doctor before giving him aspirin. The mother did not ask anyone to translate the label or package insert into Spanish, even though other members of her household could have done so. *Id.* at 544, 25 Cal.Rptr.2d 97, 863 P.2d 167.

The primary question in *Ramirez* was whether the drug manufacturer had a duty to provide warnings in Spanish. The Court concluded it did not. *Id.* at 555, 25 Cal.Rptr.2d 97, 863 P.2d 167. After losing on this ground, the plaintiff asserted an alternative ground of liability: that, lack of Spanish warnings aside, the English label provided defective warnings. *Id.* The Court rejected this argument because the plaintiff's mother "neither read nor obtained translation of the product labeling. Thus, there is no conceivable causal connection between the representations or omissions that accompanied the product and plaintiff's injury." *Id.* The Court did not apply or even mention any rebuttable presumption that the plaintiff's mother would have read and heeded an adequate warning. *Ramirez* is strong evidence that the Court would not apply the rebuttable presumption in this case, involving a prescription drug.

Given that other no other court applying California law in this context has adopted the presumption, and several courts have failed to do so when the presumption could have been critical, this Court will not apply

it here. *Cf. Thomas v. Hoffman–LaRoche, Inc.*, 949 F.2d 806, 813 (5th Cir.1992) ("No Mississippi court has adopted a presumption of causation on facts similar to those in this case, and the failure of the Mississippi Supreme Court to mention such a presumption in *Fortenberry* strongly suggests that such a presumption does not exist under Mississippi law.").

### E. *There is No Evidence That Adequate Warnings Would Have Changed Dr. Trostler's Conduct*

■ Given the Court's conclusion that the "rebuttable presumption" is not applicable, Pfizer may prevail in its motion for summary judgment if Ms. Motus has failed to adduce evidence that Dr. Trostler would have acted differently had Pfizer provided an adequate warning about the risk of suicide associated with the ingestion of Zoloft. Ms. Motus has introduced no such evidence.

Mr. Motus did not disclose any contraindications to Dr. Trostler suggesting that he was not a good candidate for Zoloft. *Cf. Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831, 838–39 (1981) (holding that presumption was rebutted because plaintiff failed to inform her doctors of her prior history of toxemia and suggesting that in appropriate case, plaintiff can prove that better warning would have changed doctor's decision to prescribe drug where plaintiff has a prior medical history that increases non-disclosed risk); *Thomas*, 949 F.2d at 817 (plaintiff failed to prove that inadequate warning caused her injuries, in part be-

cause there was nothing in her medical history suggesting that she would suffer an adverse reaction to Accutane).

Mr. Motus did not exhibit symptoms that became progressively worse over a period of time. *Cf. McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522, 539 (1974) (substantial evidence supported finding that adequate warnings would have changed doctor's decision to permit plaintiff to continue using birth control pills because plaintiff had cumulative symptoms that developed over a period of time); *see also Stanback*, 657 F.2d at 645 n. 4 (noting that plaintiff may establish causation in failure to warn cases "not only by showing that a properly warned physician would not have given the patient a certain medicine, but also by showing that a properly warned physician could have detected early signs of an adverse reaction to a drug and reduced the injury"). Under *McEwen* and *Stanback*, Ms. Motus may have been able to create a genuine issue if, for example, Dr. Trostler became aware that Mr. Motus experienced adverse reactions to Zoloft such as confusion, akathisia, or suicidal thoughts. But Mr. Motus ingested Zoloft for, at most, only six days and Dr. Trostler testified in his deposition that he did not speak to Mr. Motus or any member of his family after he prescribed Zoloft to Mr. Motus.[6]

Nor has Ms. Motus produced evidence that the risk of suicide associated with Zoloft is so high that it would have affected Dr. Trostler's (or any reasonable physician's) decision to prescribe Zoloft to a moderately depressed patient.[7] "The bur-

---

**6.** At the hearing and again in her supplemental briefing, Plaintiff attempted to introduce claimed facts not included in her Opposition papers to support her argument that the inadequate warnings caused her injury. The Court declines to consider these new "facts." Fed.R.Civ.P. 56; Local Rule 56–2 (requiring party who opposes motion for summary judgment to file a "concise 'Statement of Genuine

Issues' setting forth *all* material facts as to which it is contended there exists a genuine issue necessary to be litigated") (emphasis added).

**7.** *Cf. Smith v. Pfizer Inc.*, 2001 WL 968369 (D.Kan.2001), where another federal court presiding over Zoloft litigation touched on some of the available data.

den [is] on the plaintiff to demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Thomas*, 949 F.2d at 815 (1992) (plaintiff who suffered seizures after taking Accutane failed to prove that an inadequate warning caused her injuries because the risk of seizures from Accutane is so low that it could not have affected the doctor's decision to prescribe the medication); *see also Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099 (5th Cir.1991) (unlikely that doctor would have changed his mind to implant artificial heart valves where the risk undisclosed by the warnings—a .03 percent per annum rate of failure due to soot pockets—was minimal and "plaintiff failed to present any specific evidence that this . . . risk would have changed [the doctor's] decision"); *Stanback*, 657 F.2d at 645 (plaintiff could not prove that manufacturer's failure to warn that its flu vaccine could cause Guillian–Barre Syndrome (GBS) caused her to contract GBS, because even if manufacturer had provided adequate warnings, a reasonable physician still would have administered the flu vaccine "despite the slight risk" that plaintiff would contract GBS).

Next, Plaintiff has presented no evidence that Dr. Trostler relied on statements from Pfizer in making his decision to prescribe Zoloft to Mr. Motus. Dr. Trostler's recollection of how he learned about Zoloft is vague. But he did state unequivocally that in making that decision, he did not rely either on any statements Pfizer representatives made to him nor any written materials they may have provided to him. Indeed, Dr. Trostler stated that he did not read the package insert or PDR entry for Zoloft until after Mr. Motus committed suicide. It follows that the inclusion of adequate warnings in that information would not have affected his decision.

In *Strumph v. Schering Corp.*, 133 N.J. 33, 626 A.2d 1090, 1090 (1993), the New Jersey Supreme Court reversed the intermediate appellate court's denial of summary judgment to the manufacturer of Trilafon, and in doing so, it adopted the reasons stated in the dissenting opinion of the intermediate court. The dissenting judge believed that the plaintiff could not prove that adequate warnings would have altered the doctors' decision to prescribe Trilafon to the plaintiff because they "unequivocally denied" that the manufacturer's incomplete warnings influenced their decision to prescribe the drug. *Strumph v. Schering Corp.*, 256 N.J.Super. 309, 606 A.2d 1140, 1148 (Skillman, J., dissenting). One doctor testified that he had not read the package insert accompanying Trilafon or seen any warnings from the manufacturer. Instead, the doctors gained their knowledge of the drug from independent sources, such as their formal education in psychiatry, their review of the literature in the field and their own clinical experience. *Id.* Because the doctors did not rely on information from Trilafon in making their decision to prescribe the drug to the plaintiff, the dissent, which the Supreme Court later adopted, would have granted summary judgment to the defendants on the issue of proximate cause. Similarly, because Dr. Trostler did not rely on information from Pfizer in making his decision to prescribe Zoloft to Mr. Motus, Plaintiff cannot prove that adequate warnings would have changed Dr. Trostler's decision to prescribe Zoloft to Mr. Motus.

Ms. Motus argues that Dr. Trostler's credibility is a jury question. Plaintiff is correct that some courts permit a plaintiff to get past the summary judgment phase even when a prescribing doctor makes unequivocal statements demonstrating that adequate warnings would not have changed his or her decision to prescribe a drug. In *Williams*, for example, the doc-

tor who administered a polio vaccine testified that he was aware at the time he prescribed the vaccine of the warnings contained in the package insert and PDR entry, and that he considered the risk that a patient might contract polio when deciding whether to warn the patient of that risk. 591 F.Supp. at 385. The court held that despite this statement, "[w]hat Dr. Furlong might or might not have done involves to some degree his credibility. Thus, we conclude that it is for the jury to determine whether the presence of an adequate warning would have made no difference in Dr. Furlong's decision." *Id.* at 387; *see also Doe v. Miles Laboratories, Inc.,* 927 F.2d 187, 194 n. 32 (4th Cir.1991) (stating in dicta that "[a]lthough Dr. Martinez testified that she would have administered the drug regardless of the AIDS risk, her hindsight opinion is not conclusive of what she would have done had she been invested with all pertinent facts regarding Koyne. Thus, the causation issue . . . presents a genuine issue of material fact").

The Court declines to apply the *Williams* and *Doe* approach here. If Dr. Trostler's testimony on this point were "equivocal or uncertain," or if there was evidence placing his credibility in question, the Court might agree that it should "reserve the issue of credibility for the jury's determination." *Cf. Windham,* 786 F.Supp. at 612 (plaintiff could not prove that adequate warnings would have changed doctor's decision to prescribe Phenergan where he "unequivocal[ly]" testified that he would have prescribed Phenergan even in light of full warnings). Here, there is no such equivocal evidence in the record, nor evidence undermining Dr. Trostler's veracity. Indeed, Plaintiff never asked Dr. Trostler what could have been (depending on the answer) the following dispositive question: "Dr. Trostler, if even without reading the package insert you had become aware that Pfizer itself

had disclosed that [whatever is the precise warning regarding suicide that plaintiff considers necessary], would you have prescribed Zoloft to Mr. Motus?"

Plaintiff's lawyer did ask Dr. Trostler: "If you had been told that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, is that the kind of information you would pass on to your patients?" Dr. Trostler responded, "Yes." Plaintiff argues that this response creates a genuine issue as to whether Dr. Trostler would have changed his behavior had Pfizer provided adequate warnings. The Court does not agree. Given that this case is about the sufficiency of the warnings accompanying Zoloft, the appropriate question would have been: "If Zoloft's package insert had contained a warning that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, would you have prescribed Zoloft to Mr. Motus?" But Plaintiff's lawyer did not ask this question, and at the hearing, in response to the Court's inquiry why not, he displayed commendable candor in acknowledging that he, and probably defense counsel as well, were afraid of how Dr. Trostler might respond. The testimony Dr. Trostler did give does not establish that if that warning had been provided, he would not have prescribed Zoloft or would have told Mr. Motus something other than what he did say.

On this record Plaintiff has failed to create a question of fact for the jury, especially given that it would appear to be against Dr. Trostler's professional interest to testify as he did. (It is hardly a testament to his diligence that he did not read the package insert before prescribing Zoloft to Mr. Motus.) Moreover, *Williams* aside, most cases do not permit a plaintiff to get past summary judgment where the doctor made unequivocal statements in a pre-trial deposition demonstrating that adequate warnings would not have affected

his or her decision to prescribe a drug.[8] *See, e.g.,Stanback,* 657 F.2d at 644–45 (Virginia law); *Plummer,* 819 F.2d at 358 (California law); *Windham,* 786 F.Supp. at 612 (Mississippi law); *Strumph,* 626 A.2d at 1090 (New Jersey law); and *Thomas,* 949 F.2d at 817 (Mississippi law).

Furthermore, there is precedent for the proposition that even if Dr. Trostler were discredited at a trial, Plaintiff still might not be able to prove causation. *See Plummer,* 819 F.2d at 358 ("It may be true that [the prescribing doctor] was an interested witness, but his was the only testimony on the issue of proximate cause. Even if the jury failed to credit him, [the plaintiff] has not proven an essential element of his case."); *see also* the initial dissenting opinion in *Strumph,* 606 A.2d at 1140, which the New Jersey Supreme Court adopted, 133 N.J. 33, 626 A.2d 1090 (1993) ("[E]ven if there were a basis for doubting the credibility of the doctors' deposition testimony, such doubts would not provide a sufficient foundation for an affirmative jury finding that plaintiff established by a preponderance of the evidence that more prominent warnings of the risks in the PDR would have altered the doctors' decision to prescribe Trilafon.").

### F. *Dr. Trostler's Awareness of A Risk*

Dr. Trostler stated that before he prescribed Zoloft to Mr. Motus, he was aware that there were some claims that SSRI drugs were linked to increased suicide and violence, but that he discounted these claims based on his personal experience. Pfizer argues that this testimony creates an independent ground on which to grant it summary judgment because a manufacturer cannot be liable for failing to warn of a risk of which a physician is already aware. *See Plenger,* 11 Cal.App.4th at

362, 13 Cal.Rptr.2d 811. The Court need not decide whether this piece of Dr. Trostler's testimony is a sufficient ground on which to grant summary judgment to Pfizer because Pfizer is already entitled to summary judgment for the reasons stated above.

### G. *Overpromotion*

In her complaint, Plaintiff alleges that Pfizer overpromoted Zoloft: "Pfizer aggressively distributed and marketed Zoloft, encouraging all types of physicians (including those who have no specialized training or expertise in the mental health field such as Dr. Trostler) to dispense and prescribe Zoloft, not only for depression, but also for other maladies." FAC ¶ 21. Plaintiff alleges that this alleged overpromotion "has nullified what warnings Pfizer has given regarding this drug." FAC ¶ 25. On the basis of these allegations, Plaintiff argues that Pfizer's "overpromotion" caused Dr. Trostler to prescribe Zoloft despite his awareness of the alleged risk that Zoloft can cause patients to commit suicide.

An overpromotion theory is one way that a plaintiff in a failure-to-warn case can overcome the manufacturer's argument either (1) that it provided adequate warnings or (2) that the doctor's decision to prescribe a drug despite his awareness of its dangers was an intervening cause sufficient to vitiate the manufacturer's liability. *See Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653 (1973) ("[A]n adequate warning to the [medical] profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given."); *see also id.* at 69, 107

---

**8.** The result in *Williams,* an Ohio case, may have been dictated to some extent by the fact that Ohio applies the rebuttable presumption.

Cal.Rptr. 45, 507 P.2d 653 ("[I]f it was reasonably foreseeable that physicians, despite awareness of the dangers of Chloromycetin, would be consciously or subconsciously induced to prescribe the drug when it was not warranted, Parke Davis cannot be relieved of liability because of the intervening act of Dr. Beland in prescribing the drug while cognizant of its dangers.").

The logic of an overpromotion theory is that the manufacturer's aggressive marketing caused a physician to discount a known risk when prescribing a drug to a patient. Because this Court's ruling is based only on the ground that Plaintiff failed to prove that Dr. Trostler would not have prescribed Zoloft if an adequate warning had been provided, not on his awareness of claims that SSRI drugs were linked to increased suicide, there is no need to address whether Pfizer's alleged overpromotion contaminated Dr. Trotsler's decision. Nevertheless, it is noteworthy that Mr. Motus had no contraindications, his symptoms did not develop over a period of time, there is no evidence that the risk of suicide was significant and, perhaps most important, Dr. Trostler did not rely on any statements from Pfizer. Under these circumstances, it would appear that Plaintiff could not demonstrate that Pfizer's alleged overpromotion caused Dr. Trostler to prescribe Zoloft to Mr. Motus. *Cf. Huntman,* 1998 WL at 663362 *6 (plaintiff could not prove that overpromotion caused doctor to use screws for pedicle fixation where there was "no evidence that Dr. Thompson relied on any statements by defendant in determining the appropriate course of action for plaintiff's treatment").

## IV.

### CONCLUSION

Ms. Motus points to no evidence establishing that Dr. Trostler would have acted differently had Pfizer provided an adequate warning about the alleged risk that Zoloft causes those who ingest it to commit suicide. She is therefore unable to create a genuine issue as to whether Pfizer's alleged failure to provide an adequate warning caused her injuries. All of Plaintiff's claims are premised to some extent on the allegation the Pfizer's failure to warn caused her injuries. Accordingly, Defendant is entitled to summary judgment.

IT IS SO ORDERED.