Adriann **GEORGES**

v.

**NOVARTIS PHARMACEUTICALS CORP., et al.**

**Case No. CV 06–05207 SJO (VBKx).**

United States District Court,
C.D. California.

Dec. 30, 2013.

Thomas E. Rubbert, Thomas E. Rubbert and Associates, Pasadena, CA, Cheryl Pauline Robertson, John A. Girardi, Molly B. Weber, Thomas Vincent Girardi, Girardi Keese, Los Angeles, CA, Elizabeth R. Odette, Lockridge Grindal Nauen PLLP, Minneapolis, MN, John Julian Vecchione, Valad and Vecchione PLLC, Fairfax, VA, for Adriann Georges.

Gregory S. Chernack, Joe G. Hollingsworth, Katharine R. Latimer, Hollingsworth LLP, Washington, DC, Joseph M. Price, Mark Joseph Winebrenner, Faegre Baker Daniels LLP, Minneapolis, MN, Natasha N. Dawood, Richard A. Clark, Parker Milliken Clark O'Hara and Samuelian APC, Los Angeles, CA, Regina M. Rodriguez, Faegre and Benson LLP, Denver, CO, for Novartis Pharmaceuticals Corp., et al.

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR NEW TRIAL
[Docket No. 354]

S. JAMES OTERO, District Judge.

This matter comes before the Court on Defendant Novartis Pharmaceuticals Corp.'s ("Defendant") Motion for Judgment as a Matter of Law, or, in the Alternative, for New Trial ("Motion"), filed on October 22, 2013. Plaintiff Adriann Georges ("Plaintiff") filed an Opposition to the Motion on November 18, 2013, and Defendant responded in support thereof on November 25, 2013 ("Reply"). The Court found this matter suitable for disposition without oral argument and vacated the hearing set for December 9, 2013. *See* Fed.R.Civ.P. 78(b). For the following reasons, the Court **DENIES** Defendant's Motion.

## I. *FACTUAL AND PROCEDURAL HISTORY*

The following facts were established at trial. Defendant is a manufacturer of two drugs, Aredia and Zometa ("Treatment Drugs"), which are bisphosphonates used

in the treatment of cancer that has metastasized to the bones. (Trial Tr. Day 2, 212:9–11, 213:2–6, Apr. 10, 2013, ECF No. 284.) These drugs are prescribed to limit or prevent skeletal complications of various types associated with such metastases. (Trial Tr. Day 2, 85:7–23.)

Osteonecrosis of the jaw ("ONJ") is an osseous pathology leading to the deterioration and death of bone in the jaw. Following reports of ONJ in patients taking the Treatment Drugs, in September 2003 Defendant placed a warning on its label regarding the risk of ONJ. (PX–413, App. of Exs. Cited in Supp. of Mot. ("Exhibits Appendix") 175, ECF No. 354–5; Trial Tr. Day 2, 182:11–16.) Intravenous bisphosphonates like the Treatment Drugs are linked to the development of ONJ. (Trial Tr. Day 5, 171:15–19, Apr. 16, 2013, ECF No. 294.)

In August 1999, Plaintiff was diagnosed with metastatic breast cancer that had spread to the bones. (Trial Tr. Day 7, 160:1–22, 161:14–16, Apr. 18, 2013, ECF No. 316.) When she was diagnosed, Plaintiff began taking Aredia at the advice of her oncologist, Dr. James Waisman.

(Trial Tr. Day 7, 160:9–22.) She switched to Zometa in early 2002. (Trial Tr. Day 7, 163:1–6.) In March 2000, Plaintiff's jaw problems began. (Trial Tr. Day 7, 164:7–9; PX–1157, Exs. App. 202.) Over the next three years, several of Plaintiff's teeth were extracted or fell out. (Trial Tr. Day 7, 165:16–166:4.) Plaintiff continued treatment with Zometa until 2005, when Dr. Waisman put her treatment on hold pending concerns that the Treatment Drugs were associated with her jaw problems. (Trial Tr. Day 7, 25:5–26:3.) Dr. Eric Sung diagnosed Plaintiff with ONJ in the right and left mandible and treated her accordingly. (Trial Tr. Day 5, 31:13–34:3.) Plaintiff continues to suffer from symptoms of ONJ. (Trial Tr. Day 7, 170:4–172:7; 174:19–177:18.)

Plaintiff filed the current case against Defendant in Los Angeles County Superior Court, from which Defendant removed the case to this Court on August 18, 2006. (Notice of Removal, ECF No. 1.) On October 12, 2006, the United States District Court for the Middle District of Tennessee ("MDL Court") approved transfer of the case to that district as part of a Multidistrict Litigation ("MDL") that handled discovery and resolution of preliminary issues for multiple cases asserting bisphosphonate-ca used ONJ against Defendant. (*See* Conditional Transfer Order, ECF No. 14.) The case was transferred back from MDL Court on July 28, 2011, for resolution of case-specific questions. (*See* Notice of Transfer/Remand and Reopening of Case, ECF No. 17.)

Trial in this case began on April 9, 2013. On April 19, 2013, Defendant filed a Rule 50(a) Motion for Judgment as a Matter of Law. (ECF No. 304.) The Court denied this motion. (ECF No. 319.) On April 24, 2013, the jury found for Plaintiff and awarded her a total of $2,162,000. (ECF No. 336; *see generally* Trial Tr. Day 11, Apr. 24, 2013, ECF No. 333). The Court issued Judgment in the case on September 24, 2013. (ECF No. 349.) Defendant filed the present Motion on October 22, 2013. Plaintiff has filed an Opposition (ECF No. 356), and Defendant has replied in support (ECF No. 358).

## II. *DISCUSSION*

### A. *Judgment as a Matter of Law*

■■■ A motion for judgment as a matter of law ("JMOL") may only be granted where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Alaska Rent–A–Car, Inc. v.*

*Avis Budget Grp., Inc.,* 709 F.3d 872, 884 (9th Cir.2013); *see also* Fed. R. Civ. Proc. 50(a) (noting that a court may grant JMOL where "a reasonable jury would not have had a legally sufficient evidentiary basis to find for" a party on a particular issue). In applying this test, the Court is required to "draw all inferences in favor of the verdict." *Id.* The Court also "may not make credibility determinations or weigh the evidence," because those are "jury functions." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In short, the Court "may not reject the jury's verdict simply because another appears preferable." *McEuin v. Crown Equip. Corp.,* 328 F.3d 1028, 1037 (9th Cir.2003). The Court conducts the same analysis for an initial motion for JMOL before the verdict and for a renewed motion for JMOL after a verdict is returned. Fed. R. Civ. Proc. 50.

### 1. Defendant's Duty to Warn

■ Defendant first argues that Plaintiff failed to present sufficient evidence at trial that Defendant had a duty to warn Plaintiff of the risks of ONJ. (Mot. 4–8.) In California, a drug manufacturer only has a duty to warn of a drug's risks if those risks are "either known or reasonably scientifically knowable at the time of [the drug's] distribution." *Brown v. Superior Court,* 44 Cal.3d 1049, 1069, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). Defendant argues that there was no evidence presented at trial that it knew or could have known of the risks associated with the Treatment Drugs before Plaintiff developed ONJ in 2000. (Mot. 5–6.) Instead, Defendant asserts that the only "safety signals" presented at trial hinting that the Treatment Drugs posed any risk of ONJ occurred in 2002 or later. (Mot. 5–6.)

■ However, Plaintiff presented two pieces of evidence at trial that pre-dated Plaintiff's development of ONJ. Taken together, this evidence was sufficient to establish that Defendant reasonably could have known of the risks of prescribing the Treatment Drugs, and thus had a duty to warn Plaintiff of the risks of ONJ. First, Dr. Jonathan Green, a clinical research physician who works for Defendant, testified that he had the article "The Progress of the Periodontal Syndrome in the Rice Rat—II" by Gotcher and Jee in his files in 1986. (Trial Tr. Day 6, 145:21–146:4, Apr. 17, 2013, ECF No. 313; *see also* Trial Tr. Day 2, 141:1–10.) In this article, the authors found that certain rats given a bisphosphonate develop nonviable or dead bone in their mouths. (Trial Tr. Day 2, 140:2–25.) While Dr. Suzanne Parisian, a medical officer with the Food and Drug Administration ("FDA"), did not specifically state that this article was a "safety signal" (Mot. 6), she did testify that it served as "a similar animal model for a process similar to what was occurring in human beings," once the risk of ONJ was discovered (Trial Tr. Day 2, 139:1–140:25). Defendant did not provide the FDA with this study (Trial Tr. Day 2, 141:16–19), so the FDA could not ensure that the clinical trials were designed with the study in mind (Opp'n 14).

Second, Defendant retrospectively provided the FDA with a chart of ONJ cases that occurred during the clinical trial. (PX–509, Exs. App. 179.) Dr. Robert Marx, Plaintiff's expert witness on general causation issues, testified that five of these six reported cases were consistent with ONJ. (Trial Tr. Day 5, 193:3–20.) While these cases were not reported as drug related, as serious adverse events, or as cases of ONJ before the development of Plaintiff's ONJ (Trial Tr. Day 3, 68:6–73:11, Apr. 11, 2013, ECF No. 286), these five clinical results and the Gotcher and Jee article are

sufficient to establish that Defendant could reasonably have known of the risks of prescribing the Treatment Drugs before Plaintiff developed ONJ. If the clinical trials were designed and the clinical results were investigated in light of the Gotcher and Jee article, the resulting clinical ONJ cases could reasonably have alerted Defendant to the risks of the Treatment Drugs. The Court thus **DENIES** Defendant's Motion on this issue.

### 2. Causal Link Between Failure to Warn and Plaintiff's ONJ

■ Next, Defendant argues that Plaintiff failed to present sufficient evidence at trial that Defendant's failure to warn of the risks of the Treatment Drugs caused Plaintiff's ONJ. (Mot. 8–12.) Under California law, Plaintiff must show that Defendant's failure to properly warn was a "substantial factor" in bringing about Plaintiff's injuries. *Motus v. Pfizer Inc.,* 196 F.Supp.2d 984, 991 (C.D.Cal.2001). "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." *Bockrath v. Aldrich Chem. Co.,* 21 Cal.4th 71, 79, 86 Cal.Rptr.2d 846, 980 P.2d 398 (1999) (citation omitted). If the plaintiff would have taken the drugs and suffered the same injuries, even with an adequate warning, the defendant's failure to warn cannot have caused her injury. *See Motus,* 196 F.Supp.2d at 991.

■ "[I]n a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony." *Jones v. Ortho Pharm. Corp.,* 163 Cal.App.3d 396, 402, 209 Cal. Rptr. 456 (1985). The standard for what constitutes a "reasonable medical probability" under California law was laid out by *Jones:*

> That there is a distinction between a reasonable medical "probability" and a

medical "possibility" needs little discussion. There can be many possible "causes," indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury.

163 Cal.App.3d at 403, 209 Cal.Rptr. 456. Thus, Plaintiff must demonstrate with competent expert testimony that it was "more likely than not" that the injuries resulting from her ONJ resulted from Defendant's inadequate warnings of the risks of the Treatment Drugs.

Plaintiff presented two different theories of causation: (1) that Plaintiff would never have taken the Treatment Drugs had she received warning beforehand; and (2) that Plaintiff would have reduced or stopped her use of the drugs after ONJ symptoms developed had she known of the connection between the Treatment Drugs and the development of ONJ. (Opp'n 16.) Defendant contends that both of these theories are deficient.

### a. Plaintiff Would Not Have Taken the Treatment Drugs

■ For the first, Defendant argues that Plaintiff did not support her burden of proof in showing that she would not have taken the Treatment Drugs with adequate warning because Dr. Waisman would have prescribed the Treatment Drugs to Plaintiff in 1999 even knowing their risk. (Mot. 10.) Plaintiff does not dispute that Dr. Waisman would have prescribed these drugs even had he known the risks beforehand. (Opp'n 16–17.) Instead, Plaintiff claims to have presented trial testimony that "she would not have received [Treat-

ment Drugs] if [Defendant] had issued an adequate warning." (Opp'n 16.) Plaintiff points to two specific pieces of testimony to show that she would not have taken either Treatment Drug. (Opp'n 17.)

However, in this proffered testimony, Plaintiff does not claim that she would never have taken the Treatment Drugs. Instead, she first states that, while "[she'd] like to say [she] wouldn't take it, ... [she] would have taken it." However, she would have "been on the lookout for any symptoms" and "would have asked ... to stop or had a discussion ... when the first symptoms arose." (Trial Tr. Day 7, 181:18–182:6.) And in the second piece of testimony, Plaintiff states that she wouldn't have taken the Treatment Drugs in 2002 "because [she] was already having the symptoms." (Trial Tr. Day 7, 207:2–7.) Thus, there is no evidence that Plaintiff would have ignored Dr. Waisman's advice and declined the Treatment Drugs after being warned of the risk when she was first offered them—only that she would have stopped taking them after symptoms of ONJ first arose.

### b. *Plaintiff's Use of the Treatment Drugs Would Have Differed with Adequate Warning*

Plaintiff also argues that her use or treatment of the Treatment Drugs would have been different had she received adequate warnings beforehand, and this difference in treatment would have reduced the severity of her injury. Defendant disputes both of these claims. (Mot. 15.) At trial, Plaintiff outlined several ways her treatment, monitoring, or use of the Treatment Drugs would have changed. First, Plaintiff testified that she would have stopped or reduced her use of the Treatment Drugs once she developed ONJ symptoms if she realized these drugs could have been the cause. For example, she states that she would have "been on the

lookout for any symptoms" and that she wouldn't have taken the drugs in 2002 "because [she] was already having the [ONJ] symptoms." (Trial Tr. Day 7, 181:18–182:6, 207:2–7.) While some of this testimony may have contradicted prior deposition testimony, it was up to the jury to make a credibility determination. This alone is sufficient for a jury to find that Plaintiff's use of the Treatment Drugs would have changed with adequate warning.

Plaintiff also presented evidence supporting the proposition that her use of the Treatment Drugs would have differed had Defendant adequately warned her oncologist of the connection between the Treatment Drugs and ONJ. At trial, her treating physician, Dr. Waisman, testified that he changed his treatment practices once he was aware of the risk of ONJ presented by the Treatment Drugs. (Trial Tr. Day 7, 33:20–35:2.) Even though Plaintiff's counsel did not ask Dr. Waisman specifically if he would have changed her treatment had he been aware of the risk of ONJ, the evidence that he had changed his treatment practices for other patents could lead a jury to find that he would have done the same with Plaintiff had there been adequate and earlier warning. Defendant argues that this is insufficient under *Motus*. (Mot. 16.) However, the facts here differ from the facts in *Motus*, where the plaintiff's doctor testified that he did not read a drug's package insert warning of side effects before prescribing it. 196 F.Supp.2d at 995–98. It was unlikely that the doctor in *Motus* would have made prescription changes based on a warning label he did not read, but Dr. Waisman has made no such statement here.

Plaintiff also presented evidence that changes to her treatment could have prevented or reduced the severity of her injury. Dr. Marx testified that "[d]efinitely

... the dose and the duration you take [the Treatment Drugs], like most any medicine, is related to the number and the severity of side effects. [The development of ONJ] is a side effect. The longer you take it, the more you take it, the more side effects and the worse they are; simple as that." (Trial Tr. Day 5, 185:20–186:14.) Furthermore, Dr. Sung testified that "the longer [patients] on [the Treatment Drugs], the more they're on it, the time and severity [of ONJ] or the time it takes to heal seems to increase and the severity [of ONJ] also seems to increase." (Trial Tr. Day 5, 50:24–51:15.) Defendant argues that this is insufficient because it is general testimony about the Treatment Drugs and not specific to Plaintiff's case of ONJ. (Mot. 16–17.) However, Plaintiff's experts are not equivocal about the relationship between dosage with the Treatment Drugs and severity of the symptoms. Instead, these doctors clearly stated that reducing a patient's exposure to the Treatment Drugs would likewise have reduced the severity of her symptoms "within a reasonable medical probability based upon competent expert testimony." *Jones*, 163 Cal. App.3d at 402, 209 Cal.Rptr. 456.

▬ Defendant also argues that Plaintiff's case rests on the "loss of chance" doctrine, which California has rejected. (Mot. 14.) However, "a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir.2009) (internal quotations omitted). Here, Defendant's counsel did not raise a "loss of chance" argument in its Rule 50(a) motion for JMOL. (*See generally* Mot. for JMOL ("First

JMOL Motion"), ECF No. 304.) Rather, Defendant argued only that Plaintiff had failed to present sufficient non-speculative evidence to demonstrate the element of causation. (First JMOL Mot. 7–11.) Defendant therefore may not raise this argument in its current Rule 50(b) Motion.

Moreover, Defendant's argument also fails for a more fundamental reason: it misunderstands the "loss of chance" doctrine. This doctrine, which California courts have rejected, allows a plaintiff to recover if, "but for the defendant's negligence, the plaintiff *might possibly* have avoided an adverse result." *Dumas v. Cooney*, 235 Cal.App.3d 1593, 1609–10, 1 Cal.Rptr.2d 584 (1991) (emphasis in original). However, Plaintiff's argument is not that she "might possibly" have avoided her injury, had Defendant provided adequate warning, but that she would reduced the severity of her injury within a reasonable medical probability. Both Dr. Sung and Dr. Marx testified that longer duration and higher dosages of treatment with the Treatment Drugs lead to more severe symptoms of ONJ. (Trial Tr. Day 5, 185:20–186:14; Trial Tr. Day 5, 50:24–51:15.) These statements were not uncertain guesswork, but instead described a clear and consistent relationship between a patient's exposure to the Treatment Drugs and the severity of the symptoms that the patient would suffer. Thus, Plaintiff has shown not that she "might possibly" have reduced her injury in some way if her treatment had changed following a warning, but that, to a reasonable medical probability, she would have reduced the severity of her injury. Thus, Plaintiff's theory of causation does not rely on the "loss of chance" doctrine.

### 3. *Causal Link Between Plaintiff's ONJ and Her Use of the Treatment Drugs*

Defendant next argues that Plaintiff did not demonstrate that her incidence of ONJ

was caused by the Treatment Drugs because the testimony of Plaintiff's only expert witness demonstrating causation, Dr. Sung, did not satisfy Plaintiff's burden of proof under California law. (Mot. 18–25.) Defendant argues that Dr. Sung's testimony is insufficient because he failed to conduct a differential diagnosis and thus eliminate other reasonable causal explanations for the injury and because his opinions are based on insufficient facts and data. (Mot. 21–22.)

 Under *Jones,* to demonstrate causation, the plaintiff must show that "in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of [the defendant's] action." 163 Cal.App.3d at 403, 209 Cal.Rptr. 456. Defendant urges this Court to consider the multiple other possible causes of ONJ and Dr. Sung's failure to explicitly disqualify these other factors, and conclude that Dr. Sung's investigation was legally inadequate to demonstrate causation here. Defendant also points to Dr. Sung's failure to review Plaintiff's medical records before making a diagnosis as further evidence that he could not possibly be aware of many other possible causes of ONJ that may have applied to Plaintiff.

However, the Court in *Jones* did not demand that a medical expert examine and eliminate every alternative possible cause; it only asked that experts provide "some scientific testimony that can be interpreted as an inference of hypothetical probability." *Id.* (quoting *Parker v. Emp'rs Mut. Liab. Ins. Co. of Wis.,* 440 S.W.2d 43, 47 (Tex.1969)). Here, Dr. Sung admitted at trial that he did not perform formal differential diagnosis in his consideration of Plaintiff's condition. (Trial Tr. Day 5, 86:7–9.) Furthermore, Dr. Sung admitted to not having looked at Plaintiff's medical history before making his diagnosis of ONJ. (Trial Tr. Day 5, 90:6–20.)

However, Dr. Sung did have a discussion with Plaintiff's oncologist, Dr. Waisman, about her medical history before diagnosing her with ONJ. (Trial Tr. Day 5, 90:16–17.) Thus, Dr. Sung had the opportunity to discuss Plaintiff's medical history prior to diagnosis. Furthermore, Dr. Sung's testimony shows that he conducted an informal differential diagnosis and considered many other possible causes of Plaintiff's ONJ. Given the location of Plaintiff's osteonecrosis and the length of time the bone was exposed, Dr. Sung rejected chemotherapy, cancer, and corticosteroids as possible causes. (Trial Tr. Day 5, 133:7–134:7.) Instead, based on Dr. Sung's experience and knowledge in the field, he felt Plaintiff's ONJ could come from one of only two sources: high-dose radiation or bisphosphonates. (Trial Tr. Day 5, 135:9–14.) Because of Plaintiff's use of the Treatment Drugs and lack of exposure to high-dose radiation, Dr. Sung felt that it was not just probable but "obvious" that Plaintiff's ONJ was precipitated by her use of the Treatment Drugs. (Trial Tr. Day 5, 136:11–14.) Thus, Dr. Sung conducted a form of informal differential diagnosis by ruling out competing sources for Plaintiff's jaw injury for concrete reasons based on his experience and research. This is a sufficient basis for Dr. Sung to present his testimony to a jury. The Court therefore **DENIES** Defendant's request for judgment as a matter of law.

### B. *New Trial*

 Plaintiff also brings a separate request for a new jury trial pursuant to Rule 59. (Mot. 25–26.) A district court may grant a new trial on any historic grounds that have previously been established by the federal court system. Fed. R.Civ.P. 59(a)(1)(A). Such reasons for granting a new trial include situations where "the verdict is against the weight of

the evidence ... the damages are excessive, or ... for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir.2007) (internal quotations omitted). This standard for a new trial is less defined and less stringent than that for JMOL, meaning that the Court has more leeway to grant a new trial where it feels an injustice has occurred. *See* Moore's Federal Practice, 3rd Ed., Vol. 12 § 59.13[1].

In this case, Defendant argues that it is entitled to a new trial because the Court erroneously admitted evidence in support of Plaintiff's exacerbation theory that is barred under California "loss of chance" doctrine. (Mot. 25–26.) However, as discussed earlier, Plaintiff's argument that her injuries were exacerbated by the prolonged use of the Treatment Drugs is not a "loss of chance" argument. Plaintiff does not present evidence that there is a chance that the severity of her jaw injuries would be reduced, but rather that reduced doses of the Treatment Drugs would have resulted in less severe injury. This sort of testimony is not precluded by California's "loss of chance" doctrine. The Court therefore **DENIES** Defendant's request for a new trial.

### C. *Reduced Damages*

■ Alternatively, Defendant also seeks to reduce Plaintiff's economic damages award pursuant to Rule 59(e). (Mot. 26–29.) Defendant argues that the Court should limit both past economic damages and future economic damages to an amount conforming to the evidence presented at trial. "Generally, a jury's award of damages is entitled to great deference, and should be upheld unless it is 'clearly not supported by the evidence' or 'only based on speculation or guesswork.'" *In re First Alliance Mort. Co.*, 471 F.3d 977,

1001 (9th Cir.2006) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)).

Defendant claims that Plaintiff stipulated to past economic damages of $50,000 and presented no evidence at trial of additional damages. (Mot. 28; PX–1182D, Exs. App. 203–305; Trial Tr. Day 7, 180:2–181:10.) The jury nonetheless awarded Plaintiff $250,000 in past economic losses. However, Defendant's claim that Plaintiff presented no additional evidence of past damages at trial is incorrect. The stipulated-to amount of $50,000 was only for Plaintiff's treatment through the end of 2007. Plaintiff presented additional evidence of damages incurred after 2007. (PX–1166P, Decl. of John A. Girardi in Supp. of Opp'n, Ex. 6.) Thus, there was evidence that would have allowed a reasonable jury to award additional damages beyond the $50,000 figure.

■ Similarly, Defendant claims that Plaintiff's award for future economic damages is speculative because Plaintiff presented no evidence regarding the anticipated future evolution of Plaintiff's jaw injury or of the reasonable medical expenses necessary to treat this condition going forward. (Mot. 28–29.) However, Plaintiff has presented evidence of her past medical expenses, setting a baseline for reasonable medical expenses necessary to treat this condition. Furthermore, Plaintiff has testified that she continues to visit the doctor to monitor the ONJ and that she continues to suffer symptoms of ONJ. (Trial Tr. Day 7, 170:4–172:7, 173:18–20, 174:19–20, 176:6–13, 177:13–19.) Thus, the jury's award for future economic damages is not speculative but based on evidence presented at trial. The Court defers to the jury's exact calculation of Plaintiff's past and future economic dam-

ages and therefore **DENIES** Defendant's request to reduce Plaintiff's award.

III. *CONCLUSION*

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion. Pursuant to Rule 50(b)(1) the Court allows judgment on the verdict reached by the Jury in this case. This matter shall close.

IT IS SO ORDERED.